1  Allan D. NewDelman, Esq, (004066)
2  ALLAN D. NEWDELMAN, P.C.
   80 East Columbus Avenue
3  Phoenix, Arizona 85012
   Telephone: (602) 264-4550
4  Facsimile: (602) 277-0144
   Email: ANEWDELMAN@QWESTOFFICE.NET
5  Attorney for Debtor
6
7              UNITED STATES BANKRUPTCY COURT
8                    DISTRICT OF ARIZONA
9
   In re                          )   In Proceeding Under
10                                 )   Chapter 11
11 20th Street, LLC                )
                                   )   Case No. 09-20079 RTB
12                                 )
              Debtor.              )
13 _____ )   Adv. No.  09-01629 RTB
                                   )
14 20th Street, LLC                )
15            Plaintiff.           )   COMPLAINT TO DETERMINE THE
                                   )   VALIDITY, PRIORITY OR EXTENT
16 v.                              )   OF A LIEN OR OTHER INTEREST
                                   )   IN PROPERTY
17 Countrywide Home Loans          )
                                   )
18            Defendant.           )   (Re: 8512 East Roanoke Avenue,
                                   )   Scottsdale, AZ 85255)
19                                 )
                                   )
20                                 )
                                   )
21
22         NOW COMES the Plaintiff, 20th Street, LLC, by and through counsel, to hereby state for

23 its Complaint as follows:

24                                  1.

25         This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; 11 U.S.C. §

26 506(a), 11 U.S.C. § 1123(b)(5) and Rule 7001 et seq. Rules of Bankruptcy Procedure  This is a

27

28                                  1

core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(B) and 157(b)(2)(K).

2.

Plaintiff operates its business in Maricopa County, Arizona and is the Debtor in the above captioned Chapter Eleven proceeding.

3.

Defendant, Countrywide Home Loans, upon information and belief, is licensed to do, write and make residential mortgage loans in the state of Arizona.

4.

Plaintiff filed a voluntary Chapter11 petition on August 20, 2009 in the District of Arizona, Case No. 09-20079 RTB.

5.

Plaintiff, at the time of the filing of its case, was the owner of certain real property located at 8512 East Roanoke Avenue, Scottsdale, AZ 85255 the ("Property") with a legal description as follows:

> Lot 1425, of Scottsdale Estates Ten, according to the plat of record in the office of the County Recorder of Maricopa County Arizona, recorded in Book 85 of Maps, Page 24.

The Property is not the Debtor's principal place of business but investment property that is tenant occupied.

6.

The Plaintiff believes that the Property is worth $155,000.00 based on an appraisal dated July 2, 2009. A copy of the appraisal is attached hereto as Exhibit "A".

7.

The Property is subject to a first mortgage lien in favor of Countrywide Home Loans ("Countrywide"). A copy of the Deed of Trust is attached hereto as Exhibit "B". Countrywide has not filed a proof of claim but the amount owed to Countrywide as of September 9, 2009 is believed to be $246,390.46.

8.

Plaintiff asserts that the value of Countrywide's lien should be fixed at the value of the Property and to the extent that the amount owed to Countrywide is greater than the value of the Property, that amount is unsecured and shall be treated as unsecured in any Chapter 11 Plan of Reorganization.

**WHEREFORE**, Plaintiff prays that this Honorable Court find in favor of the Plaintiffs and Order the following:

    a.    That the value of the Plaintiff's property is $155, 000.00.

    b.    That the security interest of the Defendants be reduced from $246,390.46 to $155,000.00, the value of the property with $91,346.50 to be unsecured.

    c.    That the Order of this Court may be recorded and the same shall have the effect of voiding the lien on the public records to the extent that the Plaintiff's claim exceeds that value of the Property.

    d.    That this Order shall survive conversion to another Chapter or dismissal of this case.

    e.    That Plaintiffs recover any additional relief that this Court deems justified and appropriate.

RESPECTFULLY SUBMITTED, this 7th day of December, 2009.

ALLAN D. NEWDELMAN, P.C.

/s/ Allan D. NewDelman
Allan D. NewDelman, Esquire
Counsel for the Debtor/Plaintiff

4

# EXHIBIT "A"



# APPRAISAL OF REAL PROPERTY

### LOCATED AT:
8512 E. ROANOKE AVENUE
LOT 1425, SCOTTSDALE ESTATES 10
SCOTTSDALE, AZ 85257-1839

### FOR:
20TH STREET LLC
22573 N. 79TH PLACE
SCOTTSDALE, AZ 85255

### AS OF:
JULY 2, 2009

### BY:
GREGORY D. WRONSKI

# Exterior-Only Inspection Residential Appraisal Report   File # 09-07002.GW

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | |
|---|---|
| Property Address **8512 E. ROANOKE AVENUE** | City **SCOTTSDALE** State **AZ** Zip Code **85257-1839** |
| Borrower **20TH STREET LLC** | Owner of Public Record **20TH STREET LLC** County **MARICOPA** |

Legal Description **LOT 1425, SCOTTSDALE ESTATES 10**

| Assessor's Parcel # **131-34-075** | Tax Year **2008** | R.E. Taxes $ **1,074.36** |
|---|---|---|
| Neighborhood Name **SCOTTSDALE ESTATES 10** | Map Reference **127 * 36** | Census Tract **2178.00** |

Occupant ☐ Owner ☒ Tenant ☐ Vacant     Special Assessments $ **NONE**     ☐ PUD   HOA $ **N/A** ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) **MARKET VALUE**

Lender/Client **20TH STREET LLC** Address **22573 N. 79TH PLACE, SCOTTSDALE, AZ 85255**

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s). **DATA SOURCES USED INCLUDE: MLS. THE SUBJECT IS NOT CURRENTLY OFFERED FOR SALE.**

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. **THE SUBJECT IS NOT CURRENTLY UNDER CONTRACT TO SELL.**

**CONTRACT**

Contract Price $ **N/A** Date of Contract **N/A** Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s) **N/A**

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid.     **N/A**     **N/A**

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | | PRICE $ (000) | AGE (yrs) | One-Unit | 80 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | Low **113K** | 40 | 2-4 Unit | % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | | High **285K** | 60 | Multi-Family | 15 % |
| | | | | | | Pred. **210K** | 48-52 | Commercial | 5 % |
| | | | | | | | | Other | % |

Neighborhood Boundaries **THOMAS ROAD TO THE NORTH, PIMA ROAD TO THE EAST,**
**MCDOWELL ROAD TO THE WEST AND HAYDEN ROAD TO THE EAST.**

Neighborhood Description **THE SUBJECT IS LOCATED IN AN AREA WITHIN 5-10 MINUTES DRIVING TIME OF ALL RESIDENTIAL SUPPORT FACILITIES. THE SUBJECT APPEARS TO BE IN CONFORMITY WITH OTHER NEIGHBORHOOD PROPERTIES. NO ADVERSE CONDITIONS WERE NOTED AT THE TIME OF THE APPRAISAL INSPECTION.**

Market Conditions (including support for the above conclusions) **VALUES WITHIN THE SUBJECT'S NEIGHBORHOOD HAVE BEEN ON THE DECLINE OVER TH E PAST TWELVE MONTHS, WITH AN OVER SUPPLY OF HOMES ON THE MARKET. FINANCING IS CONVENTIONAL, FHA, AND SOME VA. TYPICAL SELLER PAID POINTS ARE IN THE 3 TO 6% RANGE.**

**SITE**

| Dimensions **70.00 X 96.00** | Area **6,720 SQFT** | Shape **RECTANGULAR** | View **AVERAGE** |
|---|---|---|---|

Specific Zoning Classification **R1-7** Zoning Description **SINGLE FAMILY RESIDENTIAL WITH 7,000 SF MINIMUM**

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | **SRP** | Water | ☒ | **CITY** | Street **ASPHALT** | ☒ | |
| Gas | ☒ | **SW GAS** | Sanitary Sewer | ☒ | **CITY** | Alley **YES** | ☒ | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone **X** FEMA Map # **04013C2160F** FEMA Map Date **9/30/2005**

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No  If Yes, describe

**NO ADVERSE EASEMENTS, ENCROACHMENTS OR OTHER ADVERSE CONDITIONS OR ADVERSE ENVIRONMENTAL INFLUENCES NOTED AT THE TIME OF THE APPRAISAL INSPECTION.**

**IMPROVEMENTS**

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☐ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☒ Property Owner
☒ Other (describe) **EXTERIOR DRIVE BY** Data Source for Gross Living Area **MLS & TAX RECORDS**

| General Description | | General Description | | Heating/Cooling | Amenities | | Car Storage | |
|---|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☒ Concrete Slab ☐ Crawl Space | | ☒ FWA ☐ HWBB | ☒ Fireplace(s) # **1** | | ☐ None | |
| # of Stories **ONE** | | ☐ Full Basement ☐ Finished | | ☐ Radiant | ☐ Woodstove(s) # | | ☒ Driveway | # of Cars **1** |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | ☐ Partial Basement ☐ Finished | | ☐ Other | ☒ Patio/Deck **COV.** | | Driveway Surface **CONCRETE** | |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls **BRICK** | | Fuel **ELECTRIC** | | ☒ Porch **COV.** | | ☐ Garage | # of Cars |
| Design (Style) **RANCH/GOOD** | Roof Surface **ASPHALT** | | ☒ Central Air Conditioning | | ☐ Pool | | ☒ Carport | # of Cars **1** |
| Year Built **1960** | Gutters & Downspouts **OVERHANG-C** | | ☐ Individual | | ☒ Fence **BLOCK** | | ☒ Attached | ☐ Detached |
| Effective Age (Yrs) **12-15 YEARS** | Window Type **SNG-PANE** | | ☐ Other | | ☐ Other | | ☐ Built-in | |

Appliances ☐ Refrigerator ☒ Range/Oven ☒ Dishwasher ☐ Disposal ☐ Microwave ☐ Washer/Dryer ☐ Other (describe)

Finished area **above** grade contains:     **6** Rooms     **3** Bedrooms     **1.75** Bath(s)     **1,290** Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). **ACCORDING TO A PREVIOUS LISTING THE SUBJECT HAS BEEN REMODELED WITH GRANITE COUNTER TOPS, TRAVERTINE TILED FLOORING, NEW PAINT, AND UPDATED BATHROOMS.**

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.) **THE SUBJECT IS BUILT OF GOOD QUALITY CONSTRUCTION AND IS IN OVERALL GOOD CONDITION WITH NO DEFERRED MAINTENANCE OBSERVED FROM THE EXTERIOR OF THE HOME. THERE IS NO APPARENT EVIDENCE OF FUNCTIONAL OR EXTERNAL OBSOLESCENCE. IT IS ASSUMED THAT THE SUBJECT'S INTERIOR CONDITION IS CONSTANT WITH THE OVERALL EXTERIOR CONDITION OF THE PROPERTY UNLESS OTHERWISE NOTED.**

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No
If Yes, describe.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe.

**THE SUBJECT PROPERTY CONFORMS TO OTHER NEIGHBORHOOD PROPERTIES AND THE FRONT AND REAR ELEVATION OF THE SUBJECT IS TYPICAL OF HOMES THROUGHOUT THE SUBJECT'S MARKET AREA.**

# Exterior-Only Inspection Residential Appraisal Report   File # 09-07002.GW

| There are | 8 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | 155,000 | to $ | 174,900 | . |
| There are | 33 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | 135,000 | to $ | 199,900 | . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 8512 E. ROANOKE AVENUE | 8547 E. ROANOKE AVENUE | | 2643 N. 84TH PLACE | | 8419 E. EDGEMONT AVENUE | |
| | SCOTTSDALE, AZ 85257-1839 | SCOTTSDALE, AZ | | SCOTTSDALE, AZ | | SCOTTSDALE, AZ | |
| Proximity to Subject | | 0.09 miles E | | 0.14 miles SW | | 0.10 miles W | |
| Sale Price | $          N/A | | $          145,000 | | $          161,000 | | $          149,900 |
| Sale Price/Gross Liv. Area | $          sq.ft. | $    112.40 sq.ft. | | $    138.67 sq.ft. | | $    116.20 sq.ft. | |
| Data Source(s) | | MLS/TAX RECORDS | | MLS/TAX RECORDS | | MLS/TAX RECORDS | |
| Verification Source(s) | | MLS#4116159/DOC#0414067 | | MLS#4159565/DOC#0424462 | | MLS#4042294/DOC#0414273 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | NEW CONV. | | NEW CONV | | NEW FHA | |
| Concessions | | UNKNOWN | | UNKNOWN | | UNKNOWN | |
| Date of Sale/Time | | 05/08/09-11DM | -4,400 | 05/12/09-9DOM | -3,200 | 05/08/09-198D | -3,000 |
| Location | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 6,720 SQFT | 6,954 SQFT | | 6,912 SQFT | | 6,716 SQFT | |
| View | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Design (Style) | RANCH/GOOD | RANCH/GOOD | | RANCH/GOOD | | RANCH/GOOD | |
| Quality of Construction | BRICK/GOOD | BRICK/GOOD | | BRICK/GOOD | | BRICK/GOOD | |
| Actual Age | 49 YEARS | 49 YEARS | | 49 YEARS | | 48 YEARS | |
| Condition | REMODEL-GD | AVERAGE | +10,000 | REMODEL-GD | | UPDATED-GD | +5,000 |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | +6,000 | Total Bdrms. Baths | |
| Room Count | 6    3   1.75 | 6    3   1.75 | | 5    2    2.0 | | 6    3    2.0 | |
| Gross Living Area | 1,290 sq.ft. | 1,290 sq.ft. | | 1,161 sq.ft. | +4,515 | 1,290 sq.ft. | |
| Basement & Finished | NONE | NONE | | NONE | | NONE | |
| Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | CENTRAL | CENTRAL | | CENTRL/EVAP | -500 | CENTRAL | |
| Energy Efficient Items | TYPICAL INSL | TYPICAL INSL. | | TYPICAL INSL | | TYPICAL INSL | |
| Garage/Carport | 1 CARPORT | 1 CARPORT | | 2 CARPORT | -4,000 | 1 GARAGE | -2,000 |
| Porch/Patio/Deck | COV.PATIO | COV.PATIO | | COV.PATIO | | COV.PATIO | |
| FIREPLACE | 1 FIREPLACE | NONE | +2,000 | NONE | +2,000 | NONE | |
| EXTERIOR AMENITIES | NONE | NONE | | POOL ONLY | -8,000 | NONE | |
| UPGRADES | TILE/GRANITE | INFERIOR | +5,000 | SIMILAR | | INFERIOR | +5,000 |
| Net Adjustment (Total) | | ☒ +    ☐ - | $      12,600 | ☐ +    ☒ - | $      -3,185 | ☒ +    ☐ - | $      5,000 |
| Adjusted Sale Price | | Net Adj.    8.7  % | | Net Adj.    2.0  % | | Net Adj.    3.3  % | |
| of Comparables | | Gross Adj.  14.8 % | $    157,600 | Gross Adj.  17.5 % | $    157,815 | Gross Adj.  10.0 % | $    154,900 |

I ☒ did   ☐ did   did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did   ☐ did   not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   MLS, TAX RECORDS
My research ☒ did   ☒ did   not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   MLS, TAX RECORDS
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 03/11/2009 | NO RECORD OF PRIOR | 04/29/2009 | 05/31/2006 |
| Price of Prior Sale/Transfer | DEED TRANSFER | 36 MONTH ACTIVITY | $130,221 (INVESTOR) | $288,800 |
| Data Source(s) | PER TAX RECORDS | PER TAX RECORDS | PER TAX RECORDS | PER TAX RECORDS |
| Effective Date of Data Source(s) | 07/02/2009 | 07/02/2009 | 07/02/2009 | 07/02/2009 |

Analysis of prior sale or transfer history of the subject property and comparable sales    THE SUBJECT HAS BEEN TRANSFERRED OR SOLD WITHIN THE
PAST 36 MONTHS.

Summary of Sales Comparison Approach    AS ADJUSTED THE COMPARABLE SALES ABOVE ARE CONSIDERED TO BE A GOOD INDICATOR
OF THE SUBJECT'S MARKET VALUE. PLEASE REFER TO THE ATTACHED TEXT ADDENDUM FOR A COMPLETE DISCUSSION OF
THE COMPARABLE SALES AND MARKET ADJUSTMENTS.

Indicated Value by Sales Comparison Approach $  155,000

Indicated Value by: Sales Comparison Approach $  155,000    Cost Approach (if developed) $  154,546    Income Approach (if developed) $  N/A
MOST WEIGHT WAS GIVEN TO THE MARKET APPROACH TO VALUE IN DETERMINING THE VALUE ESTIMATE STATED HEREIN. THE
COST APPROACH LENDS ADDITIONAL SUPPORT TO THE VALUE ESTIMATE. THE INCOME APPROACH IS NOT A RELIABLE
INDICATOR OF VALUE FOR SINGLE FAMILY DETACHED RESIDENCES.
This appraisal is made ☒ "as is",    ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed,   ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$  155,000   , as of   JULY 2, 2009   , which is the date of inspection and the effective date of this appraisal.

Form 2055 — *WinTOTAL* appraisal software by a la mode. inc. — 1-800-ALAMODE

# Exterior-Only Inspection Residential Appraisal Report File # 09-07002.GW

THIS APPRAISAL IS AN EXTERIOR ONLY INSPECTION. THE OVERALL CONDITION OF THE PROPERTY IS ASSUMED TO BE CONSISTENT WITH THE OVERALL APPEARANCE OF THE EXTERIOR OF THE HOME.

**PURPOSE OF THE APPRAISAL:**

THE PURPOSE OF THIS APPRAISAL IS TO ESTIMATE THE MARKET VALUE OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT BASED ON A QUANTITATIVE SALES COMPARISON ANALYSIS FOR USE IN A MORTGAGE FINANCE TRANSACTION. THE APPRAISERS OPINION OF VALUE IS TO BE USED BY THE CLIENT AND INTENDED USER(S) ONLY.

**ADDITIONAL CLARIFICATION TO THE SCOPE:**

THIS APPRAISAL IS BASED ON THE INFORMATION GATHERED BY THE APPRAISER(S) FROM PUBLIC RECORDS, OTHER IDENTIFIED SOURCES, INSPECTION OF THE SUBJECT PROPERTY AND NEIGHBORHOOD. THE ORIGINAL SOURCE OF THE COMPARABLE SALES IS SHOWN IN THE "DATA SOURCE" SECTION OF THE MARKET GRID ALONG WITH THE SOURCE OF CONFIRMATION. THE SOURCES AND DATA ARE CONSIDERED RELIABLE, WHEN CONFLICTING INFORMATION IS PROVIDED, THE SOURCE DEEMED MOST RELIABLE HAS BEEN USED.

**INTENDED USE: / INTENDED USER:**

THE INTENDED USE IS TO EVALUATE THE PROPERTY THAT IS THE SUBJECT OF THIS APPRAISAL FOR LOSS MITIGATION OR MORTGAGE SERVICING, SUBJECT TO THE STATED SCOPE OF WORK, PURPOSE OF THE APPRAISAL, REPORTING REQUIREMENTS OF THIS APPRAISAL REPORT FORM, AND DEFINITION OF MARKET VALUE. **THE INTENDED USER OF THIS REPORT IS THE LENDER/CLIENT. THE CLIENT IS : 20TH STREET LLC AND ITS SUCCESSORS OR ASSIGNS. THE LENDERS NAME WAS NOT GIVEN.**

**ADDITIONAL COMMENTS:**

THIS APPRAISAL REPORT IS NOT A HOME INSPECTION REPORT AN SHOULD NOT BE RELIED UPON TO REPORT THE CONDITION OF THE PROPERTY BEING APPRAISED. THE APPRAISER IS NOT A STRUCTURAL ENGINEER, CONTRACTOR OR BIO HAZARD EXPERT AND INSPECTIONS OF RELATED CONDITIONS SHOULD BE CONDUCTED BY THE APPROPRIATE QUALIFIED INDIVIDUAL. A TERMITE INSPECTION WAS NOT PERFORMED BY THE APPRAISER.

THE APPRAISER SPECIFICALLY RECOMMENDS THAT IF THE SUBJECT PROPERTY IS COVERED BY CC&R'S OR COVENANTS AND RESTRICTIONS ASSOCIATED WITH THE PROPERTY, THAT THESE REGULATIONS BE REVIEWED BY OUTSIDE COUNCIL AS THIS APPRAISAL DOES NOT ADDRESS THE CONTENTS OF THOSE DOCUMENTS WITH REFERENCE TO THE OPINION OF VALUE AS STATED HEREIN.

PLEASE REFER TO THE ATTACHED SUPPLEMENTAL TEXT ADDENDUM FOR ADDITIONAL COMMENTS ON THE SUBJECT PROPERTY AND COMPARABLE SALES.

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)   **THE SUBJECT'S NEIGHBORHOOD IS COMPLETELY BUILT OUT, THEREFORE THERE WERE NO VACANT LAND SALES TO ANALYSE. THE LAND EXTRACTION METHOD WAS USED TO DETERMINE THE VALUE OF THE SUBEJCT'S SITE.**

| | | | |
|---|---|---|---|
| ESTIMATED ☒ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ | 65,000 |
| Source of cost data  **MARSHALL & SWIFT COST HANDBOOK** | DWELLING   1,290 Sq.Ft. @ $   68.99 | =$ | 88,997 |
| Quality rating from cost service  **GOOD**  Effective date of cost data  **09/2008** | Sq.Ft. @ $ | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | **COV.PATIO** | =$ | 4,000 |
| **COST FIGURES WERE TAKEN FROM THE MARSHALL & SWIFT** | Garage/Carport   220 Sq.Ft. @ $   17.89 | =$ | 3,936 |
| **RESIDENTIAL COST HANDBOOK AND LOCAL BUILDER** | Total Estimate of Cost-New | =$ | 96,933 |
| **INFORMATION.** | Less     Physical   Functional   External | | |
| **PLEASE REFER TO THE ATTACHED TEXT ADDENDUM FOR** | Depreciation   19,387 | =$( | 19,387) |
| **DISCUSSION OF FUNCTIONAL OR EXTERNAL OBSOLESCENCE IF** | Depreciated Cost of Improvements | =$ | 77,546 |
| **APPLICABLE.** | *As-Is* Value of Site Improvements | =$ | 12,000 |
| | | | |
| Estimated Remaining Economic Life (HUD and VA only)   48 Years | INDICATED VALUE BY COST APPROACH | =$ | 154,546 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| | | |
|---|---|---|
| Estimated Monthly Market Rent $  **N/A**  X Gross Rent Multiplier  **N/A**  = $ | | Indicated Value by Income Approach |
| Summary of Income Approach (including support for market rent and GRM)   **THE INCOME APPROACH WAS NOT UTILIZED DUE TO INSUFFICIENT DATA TO CALCULATE GRM. SINGLE FAMILY HOMES IN THIS MARKET ARE PREDOMINATELY OWNER OCCUPIED.** | | |

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No   Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| | | | |
|---|---|---|---|
| Total number of phases | Total number of units | Total number of units sold | |
| Total number of units rented | Total number of units for sale | Data source(s) | |
| Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes   No  If Yes, date of conversion | | | |
| Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source(s) | | | |
| Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion. | | | |

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Exterior-Only Inspection Residential Appraisal Report File # 09-07002.GW

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

## Exterior-Only Inspection Residential Appraisal Report File # 09-07002.GW

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

# Exterior-Only Inspection Residential Appraisal Report  File # 09-07002.GW

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER  GREGORY D. WRONSKI | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  GREGORY D. WRONSKI | Name |
| Company Name  WRONSKI APPRAISAL SERVICES, INC | Company Name |
| Company Address  6501 E. GREENWAY PARKWAY, 103-147, | Company Address |
| SCOTTSDALE, AZ 85254 | |
| Telephone Number  (602) 774-8032 | Telephone Number |
| Email Address  WASI@COX.NET | Email Address |
| Date of Signature and Report  JULY 3, 2009 | Date of Signature |
| Effective Date of Appraisal  JULY 2, 2009 | State Certification # |
| State Certification #  20615 | or State License # |
| or State License # | State |
| or Other (describe)  State # | Expiration Date of Certification or License |
| State  AZ | |
| Expiration Date of Certification or License  6/29/2011 | SUBJECT PROPERTY |
| ADDRESS OF PROPERTY APPRAISED | |
| 8512 E. ROANOKE AVENUE | ☐ Did not inspect subject property |
| SCOTTSDALE, AZ 85257-1839 | ☐ Did inspect exterior of subject property from street |
| | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $  155,000 | COMPARABLE SALES |
| LENDER/CLIENT | |
| Name  ROBERT HIGHSMITH | ☐ Did not inspect exterior of comparable sales from street |
| Company Name  20TH STREET LLC | ☐ Did inspect exterior of comparable sales from street |
| Company Address  22573 N. 79TH PLACE, SCOTTSDALE, AZ | Date of Inspection |
| 85255 | |
| Email Address  roberthighsmith4@yahoo.com | |

Form 2055 — *WinTOTAL* appraisal software by a la mode. inc. — 1-800-ALAMODE

# Additional Listings

| FEATURE | SUBJECT | LISTING # 1 | | LISTING # 2 | | LISTING # 3 | |
|---|---|---|---|---|---|---|---|
| Address 8512 E. ROANOKE AVENUE | | 8637 E. ROANOKE AVENUE | | 7742 E. OAK STREET | | | |
| SCOTTSDALE, AZ 85257-1839 | | SCOTTSDALE, AZ | | SCOTTSDALE, AZ | | | |
| Proximity to Subject | | 0.19 miles E | | 0.98 miles SW | | | |
| List Price | $ N/A | $ | 164,900 | $ | 155,000 | $ | |
| List Price/Gross Liv. Area | $ sq.ft. | $ 142.03 sq.ft. | | $ 113.72 sq.ft. | | $ sq.ft. | |
| Last Price Revision Date | N/A | 06/26/2009 | | 02/12/2009 | | | |
| Data Source(s) | | MLS/TAX RECORDS | | MLS/TAX RECORDS | | | |
| Verification Source(s) | | MLS#4059496 | | MLS#4176167 | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing | | N/A | | N/A | | | |
| Concessions | | N/A | | N/A | | | |
| Days on Market | | 562 DAYS | | 169 DAYS | | | |
| Location | AVERAGE | AVERAGE | | AVERAGE | | | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | | |
| Site | 6,720 SQFT | 6,803 SQFT | | 6,238 SQFT | | | |
| View | AVERAGE | TYPICAL FOR | | TYPICAL FOR | | | |
| Design (Style) | RANCH/GOOD | RANCH/GOOD | | RANCH/GOOD | | | |
| Quality of Construction | BRICK/GOOD | BRICK/GOOD | | BLOCK/GOOD | | | |
| Actual Age | 49 YEARS | 49 YEARS | | 48 YEARS | | | |
| Condition | REMODEL-GD | REMODEL-GD | | AVERAGE | +10,000 | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | +6,000 | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 6 3 1.75 | 5 2 1.75 | | 6 3 2.0 | | | |
| Gross Living Area | 1,290 sq.ft. | 1,161 sq.ft. | +4,500 | 1,363 sq.ft. | -2,600 | sq.ft. | |
| Basement & Finished | NONE | NONE | | NONE | | | |
| Rooms Below Grade | N/A | N/A | | N/A | | | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | | |
| Heating/Cooling | CENTRAL | CENTRAL | | CENTRAL | | | |
| Energy Efficient Items | TYPICAL INSL | TYPICAL INSL | | TYPICAL INSL | | | |
| Garage/Carport | 1 CARPORT | 1 CARPORT | | 1 GARAGE | -2,000 | | |
| Porch/Patio/Deck | COV.PATIO | COV.PATIO | | COV.PATIO | | | |
| FIREPLACES | 1 FIREPLACE | NONE | +2,000 | NONE | +2,000 | | |
| EXTERIOR AMENITIES | NONE | NONE | | NONE | | | |
| INTERIOR UPGRADES | TILE/GRANITE | SIMILAR | | TILE ONLY | +2,000 | | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 12,500 | ☒ + ☐ - | $ 9,400 | ☐ + ☐ - | $ |
| Adjusted List Price | | Net 7.6 % | | Net 6.1 % | | Net % | |
| of Comparables | | Gross 7.6 % | $ 177,400 | Gross 12.0 % | $ 164,400 | Gross % | $ |
| Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3). | | | | | | | |
| ITEM | SUBJECT | LISTING # 1 | | LISTING # 2 | | LISTING # 3 | |
| Date of Prior Sale/Transfer | 03/11/2009 | NO RECORD OF PRIOR | | 01/20/2006 | | | |
| Price of Prior Sale/Transfer | DEED TRANSFER | 36 MONTH ACTIVITY | | $265,000 | | | |
| Data Source(s) | PER TAX RECORDS | PER TAX RECORDS | | PER TAX RECORDS | | | |
| Effective Date of Data Source(s) | 07/02/2009 | 07/02/2009 | | 07/02/2009 | | | |

Comments:

NONE

# Market Conditions Addendum to the Appraisal Report

File No. 09-07002.GW

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| | | | |
|---|---|---|---|
| Property Address **8512 E. ROANOKE AVENUE** | City **SCOTTSDALE** | State **AZ** | ZIP Code **85257-1839** |

Borrower **20TH STREET LLC**

Instructions: The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

MARKET RESEARCH & ANALYSIS

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 17 | 7 | 9 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | 2.83 | 2.33 | 3.00 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Total # of Comparable Active Listings | 47 | 26 | 25 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 16.6 | 11.2 | 8.3 | ☒ Declining | ☐ Stable | ☐ Increasing |

| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Median Comparable Sale Price | 198,000 | 144,900 | 145,000 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 106 | 58 | 145 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Median Comparable List Price | 215,000 | 167,450 | 164,900 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Median Comparable Listings Days on Market | 155 | 149 | 89 | ☒ Declining | ☐ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | 95% | 96% | 100% | ☐ Declining | ☐ Stable | ☒ Increasing |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | ☒ Yes | ☐ No | | ☐ Declining | ☒ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.). **IN THE PAST TWELVE MONTHS, THERE HAS BEEN AN INCREASE IN SELLER CONTRIBUTIONS FOR SALES OF THE TYPE OF PROPERTIES THAT ARE COMPETITIVE TO THE SUBJECT PROPERTY. THE MOST COMMON SELLER CONTRIBUTION IS THE CONTRIBUTION TO BUYER'S CLOSING COSTS.**

Are foreclosure sales (REO sales) a factor in the market? ☒ Yes ☐ No If yes, explain (including the trends in listings and sales of foreclosed properties). **THERE HAVE BEEN SEVERAL FORECLOSURE SALES OR REO'S WITHIN THE PAST TWELVE MONTHS IN THE NEIGHBORHOOD OF PROPERTIES THAT ARE COMPARABLE TO THE SUBJECT. THERE ARE CURRENTLY 1 ACTIVE BANK OWNED LISTING WITHIN THE SUBJECT'S IMMEDIATE MARKET AREA. THERE ARE ALSO SEVERAL PROPERTIES THAT ARE COMPARABLE TO THE SUBJECT THAT MAY BECOME AVAILABLE AS REO'S OR FORECLOSURE SALES IN THE NEAR FUTURE.**

Cite data sources for above information. **THE DATA SOURCES FOR THE ABOVE INFORMATION COME FROM MLS, PUBLIC RECORDS, PUBLIC TAX RECORDS AND NET VALUE CENTRAL.**

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions. **THE OVERALL TRENDS REPORTED ON THE INVENTORY ANALYSIS GRID AND MEDIUM SALES & LISTING PRICE, DOM, AND LISTING/SALES RATIO GRIDS INDICATE A DECLINING TREND IN THE PAST TWELVE MONTHS.**

CONDO/CO-OP PROJECTS

If the subject is a unit in a condominium or cooperative project , complete the following: Project Name:

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project? ☐ Yes ☐ No If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

APPRAISER

| | |
|---|---|
| Signature | Signature |
| Appraiser Name **GREGORY D. WRONSKI** | Supervisory Appraiser Name |
| Company Name **WRONSKI APPRAISAL SERVICES, INC** | Company Name |
| Company Address **6501 E. GREENWAY PARKWAY, 103-147, SCOT** | Company Address |
| State License/Certification # **20615** State **AZ** | State License/Certification # State |
| Email Address **WASI@COX.NET** | Email Address |

## Supplemental Addendum

File No. 09-07002.GW

| | |
|---|---|
| Borrower/Client | **20TH STREET LLC** |
| Property Address | **8512 E. ROANOKE AVENUE** |
| City **SCOTTSDALE** | County **MARICOPA** State **AZ** Zip Code **85257-1839** |
| Lender | **20TH STREET LLC** |

### LOCATION:

The subject is located in the **Scottsdale Estates 10** subdivision in south Scottsdale, AZ.

The neighborhood consists of mostly Ranch designed homes and the subject is in conformity with other neighborhood properties.

The area has convenient access to all major support facilities such as schools, shopping, recreational. employment and medical.

No adverse locational conditions were noted at the time of the appraisal inspection.

### MARKET CONDITIONS:

The general Phoenix real estate market has had several significant trends over the previous four to five years. During 2004 and most of 2005, property values were increasing at rates above historic levels with listing inventories under 8,000 per month. The first part of 2006 appeared to reflect the beginning of a change in the real estate market with slight downward pressure on pricing and increasing listing inventories. While core communities and high demand areas appeared to maintain property values, some of the outlying areas began to experience a market correction. 2006 reflected the first real signs of weakness in the housing market. As adjustable rate mortgage began to adjust upward listing inventories began to increase significantly as owners and investors with adjustable rate mortgages tried to sell before falling into foreclosure. These increases in inventory made it more difficult for seller to sell their homes and forced them to either decrease their listing price or turn their homes back to the lender. 2007 and 2008 nationally were the two worst years in the housing and mortgage industry. Often referred to as the "Subprime Mortgage Crisis", the significant increase in foreclosures crippled the lending industry. Dramatic shifts in lending programs were noted as secondary market money diminished. Increasing foreclosure rates, reduced lending liquidity, tumbling property values forced many lenders to close or restrict their lending practices.

While the numbers vary based on the quoted index - in general, it is believed that overall values in the Metropolitan Phoenix area were down 12-15% during 2007, with even greater declines during 2008 in most areas. It was recently reported that homes values throughout metro Phoenix have declined 50% from there market high in early 2006. Multiple listing statistical data records that Maricopa County has had an average of 60,000 active listings per month and an average of 5,500 homes sold per month over the past 24 months with anywhere between 10 to 14 months worth of inventory. It should be noted that these numbers are somewhat deficient in that they paint a very broad stroke. While some areas are down 20%+ over the previous year, other market segments have experienced lesser decline although it should be noted that no area has been immuned to some price corrections. In general, the areas hit hardest by the current market are those areas with the greatest concentration of subprime loans originated three to four years ago. Outlying communities, with significant new construction and lower price points have been hit the hardest.

There is some evidence that homes values are beginning to stabilize in neighborhoods were the predominant home value is under $150,000. Sales activity has dramatically increase throughout metro Phoenix among homes priced under $150,000 with homes often sell at or slightly above full asking price. This increase in sales activity is being fueled by lowest interest rates on record and the $8,000 tax credit given to first time home buyers which is set to expire in December of 2009.

### ADDITIONAL SUBJECT PROPERTY INFORMATION:

I have inspected the **exterior only** of the subject property and based on this inspection, find it to be safe, sound and sanitary. There are no visible signs of damage requiring repair. This is not a guaranty or warranty of any kind.

A recent listing of the subject for rent stated that the subject had been completely remodeled with granite counter tops, travertine tiled flooring, remodeled bathroom, and new paint.

Building sizes and dimensions contained in the appraisal report are only approximate. They are considered reasonable for appraisal purposes but are not intended to reflect the accuracy of an engineer's survey.

Public records indicates that the subject has a total of **1,290 sqft** of livable area. No physical measuring the home was done by the appraiser as this was a drive-by exterior inspection only.

## Supplemental Addendum

| | |
|---|---|
| Borrower/Client | **20TH STREET LLC** |
| Property Address | **8512 E. ROANOKE AVENUE** |
| City **SCOTTSDALE** | County **MARICOPA**   State **AZ**   Zip Code **85257-1839** |
| Lender | **20TH STREET LLC** |

### ADDITIONAL SALES COMPARISON ANALYSIS:

The chosen comparable sales represent the most recent and most similar area homes sold within the subject market area. These sales were selected based on similarities to the subject in location, age, livable area and quality of construction.

Recommended guidelines of **10% per line, 15% net and 25% gross** adjustments have been considered. However, the sales chosen are considered to be the best available and their integrity is maintained by reasonable and appropriate adjustments. Other sales analyzed would have required more extensive adjustments and therefore were not used in this report.

All adjustments which have been made to the comparable sales to reflect any differences between them and the subject property are based on what the local market is willing to pay for these items, as opposed to their original cost or current replacement cost. All adjustments are rounded to the nearest **$100.00.**

No adjustments are made for differences in livable area when the livable area differences between the subject and comparable sales are less than **50 sqft.**

The time adjustments are based on a **1%** per month adjustment for the declining market conditions and is calculated from the date of contract as opposed to the close of escrow date. The contract date will be listed below under heading for each sale which required a time adjustment. A time adjustment is not deemed necessary for those sales less than **30 days** old as of the effective date of this appraisal.

**Comparable sale #1** had a contract date of March 25, 2009, thus the 3% time adjustment.

**Comparable sale #2** had a contract date of April 25, 2009, thus the 2% time adjustment. This home was also completely remodeled with stainless steel appliances, tiled counter tops, remodeled bathrooms, new dual pan windows,an a new AC unit.

**Comparable sale #3** had a contract date of April 21, 2009, thus the 2% time adjustment.

All other adjustments were deemed normal as best compared to the subject.

### CONCLUSION OF VALUE:

The estimated market value of the subject is **$155,000 or $120.15** per square foot of livable area with equal emphasis placed on all three comparable sales used in this report. **Consideration was also given the competitive listings within the subject's immediate market area.**

## Subject Photo Page

| Borrower/Client | 20TH STREET LLC | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 8512 E. ROANOKE AVENUE | | | | | |
| City | SCOTTSDALE | County | MARICOPA | State | AZ | Zip Code 85257-1839 |
| Lender | 20TH STREET LLC | | | | | |



### Subject Front

**8512 E. ROANOKE AVENUE**

| | |
|---|---|
| Sales Price | **N/A** |
| Gross Living Area | **1,290** |
| Total Rooms | **6** |
| Total Bedrooms | **3** |
| Total Bathrooms | **1.75** |
| Location | **AVERAGE** |
| View | **AVERAGE** |
| Site | **6,720 SQFT** |
| Quality | **BRICK/GOOD** |
| Age | **49 YEARS** |



### Subject Front Side View



### Subject Front Side View

## Subject Photo Page

| | |
|---|---|
| Borrower/Client | **20TH STREET LLC** |
| Property Address | **8512 E. ROANOKE AVENUE** |
| City | **SCOTTSDALE**      County **MARICOPA**      State **AZ**      Zip Code **85257-1839** |
| Lender | **20TH STREET LLC** |



**STREET VIEW LOOKING EAST**
8512 E. ROANOKE AVENUE



**STREET VIEW LOOKING WEST**

# Comparable Photo Page

| Borrower/Client | 20TH STREET LLC | | | | |
|---|---|---|---|---|---|
| Property Address | 8512 E. ROANOKE AVENUE | | | | |
| City | SCOTTSDALE | County MARICOPA | State AZ | Zip Code 85257-1839 |
| Lender | 20TH STREET LLC | | | | |



### Comparable 1

**8547 E. ROANOKE AVENUE**

| | |
|---|---|
| Prox. to Subject | 0.09 miles E |
| Sales Price | 145,000 |
| Gross Living Area | 1,290 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 1.75 |
| Location | AVERAGE |
| View | AVERAGE |
| Site | 6,954 SQFT |
| Quality | BRICK/GOOD |
| Age | 49 YEARS |



### Comparable 2

**2643 N. 84TH PLACE**

| | |
|---|---|
| Prox. to Subject | 0.14 miles SW |
| Sales Price | 161,000 |
| Gross Living Area | 1,161 |
| Total Rooms | 5 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2.0 |
| Location | AVERAGE |
| View | AVERAGE |
| Site | 6,912 SQFT |
| Quality | BRICK/GOOD |
| Age | 49 YEARS |



### Comparable 3

**8419 E. EDGEMONT AVENUE**

| | |
|---|---|
| Prox. to Subject | 0.10 miles W |
| Sales Price | 149,900 |
| Gross Living Area | 1,290 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.0 |
| Location | AVERAGE |
| View | AVERAGE |
| Site | 6,716 SQFT |
| Quality | BRICK/GOOD |
| Age | 48 YEARS |

# Listing Photo Page

| Borrower/Client | 20TH STREET LLC | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 8512 E. ROANOKE AVENUE | | | | | |
| City | SCOTTSDALE | County | MARICOPA | State | AZ | Zip Code 85257-1839 |
| Lender | 20TH STREET LLC | | | | | |



### Listing 1
**8637 E. ROANOKE AVENUE**
| | |
|---|---|
| Proximity to Subject | **0.19 miles E** |
| List Price | **164,900** |
| Days on Market | **562 DAYS** |
| Gross Living Area | **1,161** |
| Total Rooms | **5** |
| Total Bedrooms | **2** |
| Total Bathrooms | **1.75** |
| Age | **49 YEARS** |



### Listing 2
**7742 E. OAK STREET**
| | |
|---|---|
| Proximity to Subject | **0.98 miles SW** |
| List Price | **155,000** |
| Days on Market | **169 DAYS** |
| Gross Living Area | **1,363** |
| Total Rooms | **6** |
| Total Bedrooms | **3** |
| Total Bathrooms | **2.0** |
| Age | **48 YEARS** |

### Listing 3
| | |
|---|---|
| Proximity to Subject | |
| List Price | |
| Days on Market | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Age | |

## Location Map

| Borrower/Client | 20TH STREET LLC | | | | |
|---|---|---|---|---|---|
| Property Address | 8512 E. ROANOKE AVENUE | | | | |
| City | SCOTTSDALE | County | MARICOPA | State | AZ | Zip Code | 85257-1839 |
| Lender | 20TH STREET LLC | | | | |



**Plat Map**

| Borrower/Client | 20TH STREET LLC | | | | |
|---|---|---|---|---|---|
| Property Address | 8512 E. ROANOKE AVENUE | | | | |
| City | SCOTTSDALE | County MARICOPA | State AZ | Zip Code 85257-1839 | |
| Lender | 20TH STREET LLC | | | | |



# County Parcels

http://www.maricopa.gov/Assessor/GIS/Maps/assessor.mwf

Tuesday, June 30, 2009 11 09 AM

STATE OF ARIZONA

# BOARD OF APPRAISAL

BE IT KNOWN THAT

## GREGORY D. WRONSKI

HAS MET ALL THE REQUIREMENTS AS A

### Certified Residential Real Estate Appraiser

In accordance with Arizona Revised Statutes and on authority of the Board of Appraisal, State of Arizona.

This certificate shall remain evidence thereof unless or until the same is suspended, revoked or expires in accordance with the provisions of law.

CERTIFICATE NUMBER
20615
EXPIRATION DATE
JUNE 30, 2011

In witness whereof the Arizona Board of Appraisal caused to be signed by the Chair of the Board and the Executive Director

Chair, Board of Appraisal          Date

Executive Director of the Board of Appraisal          Date

SHALL REMAIN PROPERTY OF ARIZONA BOARD OF APPRAISAL

EXHIBIT "B"

First American Title

After Recording Return To:
COUNTRYWIDE HOME LOANS,
INC.
MS SV-79 DOCUMENT
PROCESSING
P.O.Box 10423
Van Nuys
CA 91410-0423

Prepared By:
KATIE PARISH

——————————— [Space Above This Line For Recording Data] ———————————

RECEIVED OCT 13 ····

255-4767292

1/1 M·4

0001518956721 0006
[Doc ID #]

## DEED OF TRUST

MIN 1000157-0007391907-4

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.

**(A) "Security Instrument"** means this document, which is dated   OCTOBER 12, 2006           ,
together with all Riders to this document.
**(B) "Borrower"** is
ROBERT C HIGHSMITH, A MARRIED MAN AS HIS SOLE AND SEPARATE
PROPERTY

Borrower is the trustor under this Security Instrument. Borrower's mailing address is
22573 N 79TH PLACE
SCOTTSDALE, AZ 85255
**(C) "Lender"** is
COUNTRYWIDE HOME LOANS, INC.

Lender is a
CORPORATION

organized and existing under the laws of  NEW YORK

**ARIZONA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**

Page 1 of 11



-6A(AZ) (0206)     CHL (08/06)(d)    VMP Mortgage Solutions, Inc. (800)521-7291              **Form 3003  1/01 (rev. 6/02)**
CONV/VA



DOC ID #: 0001518956721006

Lender's mailing address is
4500 Park Granada MSN# SVB-314
Calabasas, CA 91302-1613
**(D) "Trustee"** is
FIDELITY NATIONAL TITLE INSURANCE CO

Trustee's mailing address is
PO BOX 32695
PHOENIX, AZ 85064
**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F) "Note"** means the promissory note signed by Borrower and dated   OCTOBER 12, 2006
The Note states that Borrower owes Lender
TWO HUNDRED FORTY EIGHT THOUSAND and 00/100

Dollars (U.S. $ 248,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   NOVEMBER 01, 2036        .
**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(M) "Escrow Items"** means those items that are described in Section 3.
**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the

DOC ID #: 0001518956721006

repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of

[Type of Recording Jurisdiction]

MARICOPA :

[Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number:                                                                which currently has the address of

8512 E ROANOKE AVE, SCOTTSDALE

[Street/City]

Arizona 85257-1839 ("Property Address"):

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return

them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount

not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes

available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest

in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any

provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b)

DOC ID #: 0001518956721006

"Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Time of Essence. Time is of the essence in each covenant of this Security Instrument.

DOC ID #: 00015189567210006

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
ROBERT C. HIGHSMITH                              -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

Unofficial Document

STATE OF ARIZONA,            MARICOPA            County ss:

The foregoing instrument was acknowledged before me this  10-13-06

by _____

Robert C. Highsmith

_____

_____

My Commission Expires:

_____
Notary Public

OFFICIAL SEAL
MARGARET A. LUDWIG
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Comm. Expires January 16, 2010

January 16, 2010

-6A(AZ) (0206)        CHL (08/05)        Page 11 of 11        Form 3003 1/01 (rev. 6/02)

Prepared by: KATIE PARISH

## COUNTRYWIDE HOME LOANS, INC.

Branch #: 0000729
2595 W. CHANDLER BLVD
**DATE:** 10/12/2006 CHANDLER, AZ 85224-0000
**CASE #:** Phone: (866) 628-4995
**DOC ID #:** 00015189567210006 Br Fax No.: (480) 855-2495
**BORROWER:** ROBERT C. HIGHSMITH
**PROPERTY ADDRESS:** 8512 E ROANOKE AVE
SCOTTSDALE, AZ 85257-1839

### LEGAL DESCRIPTION EXHIBIT A

Unofficial Document

FHA/VA/CONV
Legal Description Exhibit A
2C404-XX (04/03)(d)



## EXHIBIT "A "

Escrow No.  ()

Lot 1425, of SCOTTSDALE ESTATES TEN, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded in Book 85 of Maps, Page 24.

Unofficial Document

LOAN #: 151895672

# FIXED/ADJUSTABLE RATE RIDER

(LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this TWELFTH      day of OCTOBER, 2006   , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to COUNTRYWIDE HOME LOANS, INC.

("Lender") of the same date and covering the property described in the Security Instrument and located at:

8512 E ROANOKE AVE
SCOTTSDALE, AZ 85257-1839
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of      7.000 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A) Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of NOVEMBER, 2013   , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

● FIXED/ARM Rider
Interest First/Only LIBOR One-Year Index
1E460-US (10/05)(d)        Page 1 of 5





LOAN #: 151895672

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO & ONE-QUART percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 12.000 % or less than 2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 12.000 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B.1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

LOAN #: 151895672

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Unofficial Document

● FIXED/ARM Rider
Interest First/Only LIBOR One-Year Index
1E460-US (10/05)                    Page 4 of 5

LOAN #: 151895672
BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
ROBERT C. HIGHSMITH                                     -Borrower

_____ (Seal)
                                                       -Borrower

_____ (Seal)
                                                       -Borrower

_____ (Seal)
                                                       -Borrower

Unofficial Document

• FIXED/ARM Rider
Interest First/Only LIBOR One-Year Index
1E460-US (10/05)                    Page 5 of 5

# 1-4 FAMILY RIDER
## (Assignment of Rents)

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423


Prepared By:
KATIE PARISH

Unofficial Document

0001518956721006
[Doc ID #]

THIS 1-4 FAMILY RIDER is made this TWELFTH day of OCTOBER, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to
COUNTRYWIDE HOME LOANS, INC.

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
8512 E ROANOKE AVE
SCOTTSDALE, AZ 85257-1839
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**MULTISTATE 1-4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

 -57R (0401).01     CHL (06/04)(d)     Page 1 of 3
VMP Mortgage Solutions, Inc. (800)521-7291

 Initials:
Form 3170 1/01

*23991*

*15189567200000205 7R*

DOC ID #: 0001518956721006

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINST** ~~~~ **ETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and

maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____(Seal)
ROBERT C. HIGHSMITH                          - Borrower
              Unofficial Document

_____(Seal)
                                             - Borrower

_____(Seal)
                                             - Borrower

_____(Seal)
                                             - Borrower